**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHEN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| NOVEL MANAGEMENT, INC., ) | |
| d/b/a SPIN & WIN ARCADE, an Alabama Corporation; ) | |
| ALABAMA VENTURES, L.L.C., d/b/a WINNERS ) | Civil Action No. |
| WORLD ARCADE, an Alabama Limited Liability Company; ) | |
| HOT SPOT ARCADE, INC., an Alabama Corporation ) | CV 01-BU-1699-S |
| d/b/a; ISLANDS ARCADE AND CHINA GARDEN ) | |
| ARCADE; SUN RAYS, INC., an Alabama ) | |
| Corporation d/b/a SUN RAYS ARCADE; ) | |
| MICHAEL PORTER and FRANCESCO SCOPELLETTI ) | |
| d/b/a GOLD MINE ARCADE, a partnership; ) | |
| VILLA AMUSEMENT, L.L.C., an Alabama Limited ) | |
| Liability Company, d/b/a Villa Arcade; MR. R. KADE, ) | |
| INC., an Alabama Corporation, d/b/a MR. R. KADE, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| JIM WOODWARD, Sheriff of Jefferson County ) | |
| Alabama, his deputies, officers, agents and any person(s) ) | |
| acting in concert with him, ) | |
| ) | |
| Defendant. ) | |

**VERIFIED COMPLAINT SEEKING DECLARATORY JUDGMENT, TEMPORARY**
**RESTRAINING ORDER,**
**PERMANENT INJUNCTION AND DAMAGES**

**PARTIES**

1.    The Plaintiffs, Novel Management, Inc., d/b/a Spin & Win Arcade, an Alabama

Corporation; Alabama Ventures, L.L.C., d/b/a Winners World Arcade, an Alabama Limited Liability

Company; Hot Spot Arcade, Inc., an Alabama Corporation, d/b/a Islands Arcade and China Garden

Arcade;  Sun Rays, Inc., an Alabama Corporation, d/b/a Sun Rays Arcade; Michael Porter and

Francesco Scopelletti, d/b/a Gold Mine Arcade, a partnership; Villa Amusement, an Alabama

Limited Liability Company, d/b/a Villa Arcade; Mr. R. Kade, Inc., an Alabama Corporation, d/b/a Mr. R. Kade; have their principal places of business in Jefferson County, Alabama, where they are duly licensed by the Department of Revenue, Jefferson County, Alabama as legal owners of coin-operated machines that are used by the public to provide amusement or entertainment, whose operation depends in whole or in part upon the skill of the player, who is rewarded with merchandise limited to non-cash merchandise, prizes, toys, gift certificates or novelties, each of which has a wholesale value of not more than Five Dollars ($5.00). The Plaintiffs' businesses have been operating for approximately two years.

2.    The Defendant, Jim Woodward, is now and at all times mentioned was the Sheriff of Jefferson County, Alabama acting in his official capacity.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action under 28 U.S.C. §1331 and 28 U.S.C. §1343 of Title 28 of the United States Code. This Court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. §2201 and 28 U.S.C. §2202. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

4.    This is an action for declaratory judgment, injunctive relief and damages to redress the deprivation by Defendant of Plaintiffs' rights, privileges and immunities, secured by the Fourth (4th), Fifth (5th) and Fourteenth (14th) Amendment of the United States Constitution; and that deprivation of Plaintiffs' rights by the Defendant was at all times under the color of state law in violation of 42 U.S.C. §1983 and 42 U.S.C. §1988.

## FACTUAL ALLEGATIONS

5.    On July 6, 2001, the presiding Judge of Jefferson County, Alabama, Circuit Court, the Honorable Wayne Thorn, issued an order in the case styled "State of Alabama v. $1,895.00 U.S.

Currency and 32 Video Gambling Devices", Case No. CV99-7032. A copy of said order is attached

hereto and specifically referenced herein as Exhibit "1". The Plaintiffs were not included as parties

in this action. Judge Thorn's lengthy order, in substance, found 32 machines in question to be

gambling devices and slot machines in violation of Title 13 A- 12-20 Code of Alabama; considered

the machines and currency as contraband and ordered the machines destroyed and the currency

transferred to the general fund of the State of Alabama. (See pg. 18 of Order). The Plaintiffs' rights

to operate their amusement business and the amusement machines owned by the Plaintiffs are not

affected by this order and there has been no determination made by any state court concerning

whether or not the Plaintiffs have violated Title 13A -12-20 Code of Alabama or any related criminal

statute.

  6. The state statute in question, codified in Code of Alabama as Title 13A-12-76, effective

May 17, 1996, provides, in pertinent part, as follows:

> "Bona Fide coin-operated amusement machines. (a) Sections 13A-12-70 to 13A-12-75, inclusive, shall not apply to a coin operated game or device designed and manufactured for bona fide amusement purposes which, by application of some skill, only entitles the player to replay the game or device at no additional cost if a single play of the bona fide coin-operated amusement machine or device can reach no more then 25 free replays or can be discharged of accumulated free replay, or rewards the player exclusively with merchandise limited to noncash merchandise, prizes, toys, gift certificates, or novelties, each of which has a wholesale value of not more than Five Dollars ($5.00)...(d) A player of a bona fide coin-operated amusement machine may accumulate winnings for the successful play of a bona fide coin-operated amusement machine through either tokens or tickets, and may redeem these tokens or tickets for merchandise so long as the amount of tokens or tickets earned on a single play does not exceed Five Dollars ($5.00) per unit. (e)(1) For purposes of this section, "bona fide coin-operated amusement machine" means every machine of any kind or character used by the public amusement or entertainment whose operation requires the payment of or the insertion of a coin, bill, other money, token, ticket or similar object, and the result of whose operation depends in whole or in part upon

> the skill of the player, whether or not it affords an award to a
> successful player, and which can be legally shipped inter-state
> according to federal law.  Examples of bona fide coin-operated
> amusement machines include, but are not limited to, the following:
> c. video games...(2) The term "bona fide coin-operated amusement
> machine" does not include the following: j. machines which are not
> legally permitted to be operated in Alabama. k. slot machines. 1.
> Video poker games...."

7.    Judge Thorn ruled that the above-mentioned Alabama statute was void in giving a

definition of some skill.  (See pg. 12 of Order).  The validity of the ruling of Judge Thorn has not

been reviewed by any of the Alabama appellate courts and remains subject to serious question.

8.    Immediately after the entry of Judge Thorn's order, the Defendant, Jim Woodward,

(hereinafter referred to as "Woodward" or "Sheriff"), without affording the Plaintiffs any reasonable

notice or  opportunity to be heard, or any procedural or substantive due process of law, in violation

of the Fourth, Fifth and Fourteenth Amendments of United States Constitution, publicly declared

that the Jefferson County Sheriff's Department would begin confiscating the Plaintiffs' coin-

operated amusement machines on Monday, July 9, 2001.  The Defendant, Woodward's, actions

under color of state law, have been given wide publicity in both the local television, radio and print

media, including the front page news article found in Saturday, July 7, 2001, issue of the

Birmingham News/ Birmingham Post Herald newspaper, attached hereto and specifically referenced

herein as Exhibit "2".  As a result of the actions of the Defendant, Woodward, the Plaintiffs have

suffered drastic losses in business revenue and have been and will continue to be irreparably harmed

and injured, unless the Defendant, Woodward, is enjoined and restrained from closing down the

businesses of the Plaintiffs and confiscating or seizing the Plaintiffs' amusement machines.  Any

search for or seizure of amusement machines at the Plaintiffs' places of business conducted by the

Defendant or the Defendant's agents is also a violation  of the Fourth Amendment of the United

States Constitution. Plaintiffs will suffer irreparable harm, injury and damages due to the Defendant's actions which effectively terminates the Plaintiffs' businesses without any hearing and deprives them of their property rights guaranteed by the United States Constitution, unless the Defendant and Defendant's agents are enjoined by this Court from the commission of such acts.

9. At the present time other owners of coin-operated amusement machines are free to conduct their businesses in other counties of the State of Alabama, including Macon County. For example, a Ten Thousand (10,000) square foot video entertainment center has recently been opened at the Victory Land Race Track located in Shorter, Alabama, Macon County, with Three Hundred (300) amusement machines. See the newsletter entitled "Track Talk" attached hereto and specifically referenced herein as Exhibit "3".

10. The Defendant's actions have also deprived the Plaintiffs' of their rights protected by the equal protection clause of the Fourteenth Amendment. On Saturday evening, July 7, 2001, Francesco Scopelleti, one of the Plaintiffs operating the business known as Gold Mine Arcade was told by a Jefferson County Deputy Sheriff to close the business or otherwise he would be arrested by the Jefferson County Sheriff's Department. Other Plaintiffs' and their employees have been threatened by the Defendant's agents (sheriffs/deputies) on Friday, July 6, 2001, and Saturday, July 7, 2001. These acts committed by the Defendant's deputies and agents deprive the Plaintiffs of their property rights without a hearing and unless such conduct is enjoined by this Court the Plaintiff will suffer irreparable harm, injury and damages.

## DECLARATORY JUDGMENT ACTION AND INJUNCTIVE RELIEF

11. There is now existing between the parties involved in this proceeding an actual, substantial, justiciable controversy in which Plaintiffs are entitled to have a declaration of their rights and further relief, including injunctive relief and money damages due to the facts, conditions and

circumstances as set forth in this complaint. Specifically, Plaintiffs contend and Defendant disputes

that Defendant knowingly acted and continued to act to deny the Plaintiffs their rights protected by

the United States Constitution under federal law, among other acts, closing the businesses of the

Plaintiffs, threatening arrest of Plaintiffs's employees unless the Plaintiffs closed their businesses,

seizing, attempt to seize or destroy the property of the Plaintiffs, thereby, preventing the Plaintiffs

from engaging in their business of providing the public with bona fide amusement machines.

12.     Plaintiffs are without a plain, speedy, and adequate remedy at law. Therefore,

injunctive relief, including the issuance of a temporary restraining order, a preliminary injunction

and a permanent injunction is sought by the Plaintiffs. Injunctive relief is appropriate because money

damages for Plaintiffs' injuries are difficult to calculate and will not fully compensate the Plaintiffs

for the denial of their federal rights afforded them under the Constitution of the United States. Any

attempts by the Plaintiffs to obtain administrative relief would be futile. Oral notice to the

Defendant's attorney has been given by the Plaintiff's attorney of the request for the temporary

restraining order.

Wherefore, Plaintiffs request this Court to provide the following relief:

1.     After a hearing enter a declaratory judgment that the Defendant, his deputies and his
       agents have violated the federal laws and denied the Plaintiffs their federal and
       constitutional rights to operate their businesses.

2.     In order to maintain the status quo and prevent the Plaintiffs from suffering
       irreparable harm and injury this Court should enter a temporary restraining order
       prohibiting the Defendant or his agents, servants, employees or any other persons
       who aid or assists the Defendant in the commission of any acts that deprives the
       Plaintiffs of their constitutional rights, including, but not limited to, closing the
       Plaintiffs' business operations, threatening to arrest the Plaintiffs or Plaintiffs'
       employees for not closing the business operations, confiscating or attempting to
       confiscate or destroy amusement machines and or currency belonging to the Plaintiffs
       pending the issuance of a preliminary or permanent injunction.

3.     Enter a preliminary and permanent injunction, enjoining, restraining and prohibiting

the Defendant or his agents, servants or employees  or any other persons who aid or assists the Defendant in the commission of any acts that deprives the Plaintiffs of their constitutional rights, including but not limited to closing the Plaintiffs' business operations, threatening to arrest the Plaintiffs and Plaintiffs' employees for not closing the business operations, and confiscating, attempting to confiscate or destroy the amusement machines and or currency belonging to the Plaintiffs.

4.      Award the Plaintiffs compensatory damages under and pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1988.

5.      Award the Plaintiffs any and all further and different relief as this Court may deem appropriate just and proper.

Novel Management, Inc., d/b/a
Spin & Win Arcade, by William Eugene Cash,
its Director of Operations of Management

Alabama Ventures, L.L.C., d/b/a
Winners World Arcade, Horace Keith Ferrish,
Member

Hot Spot Arcade, Inc., d/b/a Islands Arcade
and China Garden Arcade, by David Clayton
Puritoy, its President

Sun Rays Arcade, Inc., d/b/a Sun Rays
Arcade, by Linda Baugh, its President

Michael Porter and Francesco Scopelletti
d/b/a Gold Mine Arcade, by Francesco
Scopelletti, Partner

Villa Amusement, L.L.C., d/b/a Villa Arcade
by Vic Lepore, Member

Mr. R. Kade, Inc., d/b/a Mr. R. Kade, by
Joe Culwell, President

**STATE OF ALABAMA** )
**JEFFERSON COUNTY** )

Before me, William Patrick Hawkins a notary public, in said state and county personally appeared before me the undersigned, William Cash, Director of Operations of Management of Novel Management, Inc., d/b/a Spin & Win Arcade; Horace Keith Ferrish, Member of Alabama Ventures, L.L.C., d/b/a Winners World Arcade; David Clayton Puritory, President of Hot Spot Arcade, Inc., d/b/a Islands Arcade and China Garden Arcade; Linda Baugh, President of Sun Rays, Inc., d/b/a Sun Rays Arcade; Francesco Scopelletti, Partner of Goldmine Arcade; Vic Lepore, Member of Villa Amusement, L.L.C., d/b/a Villa Arcade; and Joe Culwell, President of Mr. R. Kade, Inc., d/b/a Mr. R. Kade; who first being duly sworn and say on oath that all of the allegations and averments contained in the complaint are true and correct.

This _8th_ day of _July_, 2001.

William Patrick Hawkins
Notary Public
My Commission Expires:

MY COMMISSION EXPIRES JUNE 9, 2004

Samuel Maples
One of the attorneys for the Plaintiffs
1804 7th Avenue North
Birmingham, AL 35203
(205) 322-2333

Douglas Corretti
One of the attorneys for the Plaintiffs
Corretti, Newsom & Hawkins
1804 7th Avenue North
Birmingham, AL 35203
(205) 254-1164

**PLAINTIFFS DEMAND TRIAL BY JURY**

**SERVE DEFENDANT AT:**

JEFFERSON COUNTY SHERIFF'S DEPARTMENT
CRIMINAL JUSTICE CENTER
801 NORTH RICHARD ARRINGTON , JR. BLVD
ROOM 110
BIRMINGHAM, AL 35203

IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

STATE OF ALABAMA                    )
                                    )
            Plaintiff,              )
                                    )
vs.                                 )       CASE NO. CV. 1999-7032
                                    )
$1,895.00 U.S.CURRENCY and          )
32 VIDEO GAMBLING DEVICES,          )
                                    )
            Defendants.             )

**EXHIBIT 1**

## ORDER

This case was heard without a jury on May 21, 2001. Chief Deputy District Attorney Roger Brown and Deputy District Attorney Melissa Bender represented the State. John M. Bolton, III, represented the Defendant, Barry Kelly and the intervener, Kevin Sharp Enterprises, Inc.

On December 8, 1999 a petition was filed by the State of Alabama, through David Barber, District Attorney, for the Tenth Judicial Circuit of Alabama, alleging that on November 2, 1999 at 1607-A Center Point Road, Birmingham, Jefferson County, Alabama, members of the Jefferson County Sheriff's Department, Vice and Narcotics Division, in the discharge of their duties, seized $1,895.00 U.S. currency and 32 alleged video gambling devices. The petition prays that the court decree that the currency is contraband and that it should be forfeited to the State pursuant to §13A-12-30(c), *Code of Alabama*, 1975. It further petitions the court to find that the video machines are contraband and should be forfeited to the State of Alabama and destroyed pursuant to the provisions of §13A-12-30(a), *Code of Alabama*, 1975.

Kevin Sharp Enterprises, Inc. ("Sharp") intervened in the case and petitioned the court to find that the 32 seized video machines are bona fide coin-operated amusement machines pursuant to §13A-12-76 (d) *Code of Alabama*, 1975 as amended 1996. Sharp also alleges that

1

the complaint for forfeiture is untimely and violates the defendant/intervener's right of due process.

The record indicates that the machines were seized on November 2, 1999 and the State filed the forfeiture action on December 8, 1999. The court finds that a delay of five weeks in instituting the forfeiture action was timely and does not violate constitutional due process of the defendant/intervener.

Sharp is a Tennessee corporation and alleges that it is the owner of the video games, which are the subject of the petition for forfeiture. Sharp's motion to intervene states that "Barry Kelley is the operator of the business establishment where the video games were located, but has no ownership or other interest in said video games."

## FACTS OF THIS CASE

On November 2, 1999, Deputy Ronnie Edwards sent Deputy John Weatherly of the Jefferson County Sheriff's Department, Narcotics Division, to Movie Time Arcade located at 1607-A Center Point Road, Birmingham, Jefferson County, Alabama. This is in the Birmingham Division of the Tenth Judicial Circuit of Alabama. While there, he observed 32 video machines in the arcade. Stools were placed in front of each machine and there was a cashier window at the front. An attendant was present to oversee the machines. Deputy Weatherly went to a machine located in the back of the business and put $5.00 in the machine. He played the machine for 15 to 20 minutes. He identified the machine as Plaintiff's Exhibit #2. When he finished playing the machine printed out a receipt and Weatherly carried it to the cashier's window. The receipt had a cash amount of $42.80. The cashier at Movie Time stated the machine had printed a receipt out in an uneven amount and she had to check and see if she could pay $42.80 to Weatherly. She called someone on a walkie-talkie type phone and explained what had happened. That person told her she could pay Weatherly in cash. She responded by saying, "He is not a regular customer", and the individual on the walkie-talkie said, "Oh, just pay him the $45.00 in

certificates and have him sign the receipt". She then gave Weatherly the certificates and he signed the receipts and left. The nine receipts were $5.00 Wal Mart gift certificates.

Weatherly said that he did not see any video rentals or movies in the place of business. All he saw was video machines and there were other customers playing them. No one was watching a movie or renting movies. Snacks were being given to the customers such as potato chips and candy. The snacks were free.

Weatherly was able to identify the machine he had played because he wrote the State ID number in his hand. The State's ID number was located on a sticker in the upper right hand corner of the machine. He later transferred that number to a pad so he would remember the number. That number was 11879. The sticker stated State of Alabama Vending Machine License.

After Deputy Weatherly reported back to Deputy Edwards, Edwards and Detective Berry, who is an investigator with the Jefferson County Sheriff's Department, prepared an affidavit for a search warrant and presented it to Judge R. O. Hughes. After Judge Hughes reviewed the affidavit he issued the search and seizure warrant. Deputy Edwards, with some assistance, executed the warrant at the Movie Time Arcade in Center Point, Jefferson County, Alabama, and seized 32 video machines. Three video machines were marked as Plaintiff's Exhibits #1 through #3. Each of the exhibits has the serial number of a seized machine. Edwards then removed the currency from each of the machines and identified the sum that was removed from each machine. The total was $1,895.00.

Deputy Edwards stated there was no other business enterprise going on at the arcade other than the video machines. He didn't see any signs or anything that suggested that videotapes were for rent or sale.

At the time of the seizure of each machine, the deputies removed all money and then locked the machine. The power strips were turned off, unplugged and the cords were removed.

The machines were then stored and have remained in the care, custody and control of Deputy Edwards from the date of seizure to the present time.

Daryl Robert Sertell testified on behalf of the State of Alabama. He is the chairman of Casino Horizons Corporation, which is a training and consultation firm serving law enforcement and the professional gaming industry in cities such as Las Vegas, Atlantic City and Biloxi. He is a professional slot machine instructor and has been licensed for 20 continuous years by the New Jersey Casino Control Commission. He trains students on the operating characteristics of slot machines and other gaming devices. Some of those students become technicians, some are executives in training to become slot department management personnel and others are members of law enforcement. Sertell began his employment in the industry in 1956. He has received training from various manufacturers throughout 45 years on how the machines are designed, how they operate, and how they can be repaired. He has trained units of the FBI with the racketeering records analysis unit and the FBI's Indian Country Unit. He has conducted more than two-dozen training sessions for the FBI. He has inspected machines and testified concerning them numerous times. He also has employees who work in this industry under his direction. He has testified in more than two-dozen states about the industry. He is retained annually to serve as the expert on slot machines and gaming devices for the United States Department of the Interior and the National Indian Gaming Commission. He also has clients in the international community and has testified outside of the United States.

Mr. Sertell's first visit to Birmingham, Alabama was in late April of 2001. He has examined the machines, which are the subject matter of this action. On examination of the machines he found all of them were operable except one. He then referred to the repair manuals or operation manuals for each of the particular machines, proceeded to play the game on each machine and observe the operating characteristics of the game, opened each of the machines and made a notation of the boards that were there as well as other characteristics of each of the

machines and compared the exhibit list of the 32 machines with the machines that he examined and they were identical. There were two exceptions to the machines that matched. Item 17 on Exhibit #15 had the words unknown and he found that it was a Barn Yard Five by Cadillac Jack and item number 27 on Exhibit #15 bears the word unknown and he found that it was a Reel of Fortune by Cadillac Jack. Otherwise, his list matched all of the machines. He testified that he actually had more information on each of those machines than was listed in Exhibit #15. He also had the serial numbers and license numbers issued by the State of Alabama and they matched all 32 machines. State's Exhibits #4 through #14 are the operating manuals that Mr. Sertell retrieved from inside the machines. Some of the machines did not have manuals.

Sertell examined Plaintiff's Exhibit #1 and said that he recognized that particular machine. He identified it from the Alabama Revenue Sticker Number 11894 and Serial Number of 07829 and Sheriff's inventory number four. He also compared his notes for the other two machines that were in court and they matched his notes. With respect to the machines, he stated that each of the machines require that the player risk something of value to play them. Each of the machines requires that U.S. paper currency be inserted in order to achieve credits to play the game. The machines would not take coins. After the machine accepts the currency, the machine is capable of being operated by some physical act of the player. The player is then required to bet credits in order to start the game. In each of the 32 machines, there were buttons installed, but once the player begins play, the machine will complete the play absent any further action by the player. It operates automatically whether the player does anything else or not. There is a two-step process. If the player wins, the amount of the win is immediately added to the credit total that is displayed on the screen. When the player decides to stop playing and cash-out, there is a button that in some cases says, "print ticket or cash-out". If pushed, the machine will automatically eject a ticket. The outcome of the games on all 32 machines depends, in a material degree, on the element of chance.

The machines look as if they have a spinning wheel similar to those found on a slot machine. There is no spinning wheel, but rather a video graphic of a spinning wheel. In each of the 32 machines the outcome, which is displayed on the screen, is a product of a pseudo-random number generator, which is contained within the software of that machine. The machine determines in advance what symbols it's going to give the player. The player's pressing of the stop button or skill play buttons does not affect that outcome whatsoever. Sertell testified that the player could turn his back on the machine while he plays and achieve the same outcome. Each of the 32 machines has a retention device. This means that when the machines are manufactured the manufacturer builds onto the logic board, in most cases, a physical set of DIP switches. These are plastic eight switch blocks, which contain a series of eight different slide switches. They are either in the off or on position in each case. The manufacturer supplies, through their manual, the code for which you can set these. Every single machine is provided with a range of payout percentage that the owner may choose. During the inspection, Sertell compared the manuals of the actual DIP switch settings found on the machines, or in the more modern machines, it's on screen menu. The overwhelming majority of the machines are set to retain 40%. One or two are set to retain 45%. One is set to retain 38% and Item #32 on State's Exhibit #15 is set to retain 30%.

Every machine that is a gambling device has inherent odds of the game. Those odds are determined by how many different icons are on each reel. It's a mathematical range of numbers. It is referred to as the mathematical cycle of the game. As an example, a traditional slot machine that has three reels and on each of those three reels has 20 symbols. Therefore, the mathematical cycle of that game would be about 8,000 plays. The mathematical cycle of these games is the range that he was referring to when the DIP switch is set at 40% retention of the money played. The machine is programmed to attempt to keep its payout within a percentage or so of that range. Regardless of what the player does over the long range he is never going to win. The outcome of

the game is predominately dependant upon chance or the pseudo-random number generator as opposed to the skill of the player.

During cross-examination, Mr. Sertell testified that he is being paid $150 per hour for his services. To date he has not received any payment. He examined all of the machines over a 6 to 8 hour period and he felt that was adequate.

Sertell testified that the play of the games in question is comprised of three components. They are the kick off, the spin and the index. The kick off refers to the instance in time when a reel or a video representation of a reel physically kicks off and begins to move. Spin would be that time during which the icons are actually moving or appearing to move and index refers to that instance in time when they cease moving. These three factors constitute one play. During cross-examination, Mr. Sertell stated that it was his opinion that the 32 games were gambling devices. To him a gambling device is a game that offers the elements of consideration, chance and reward. Consideration is the player inserting money, currency or something of value. There are machines in which you can insert a credit card or debit card. He testified that the machines are predominately games of chance. No amount of skill on the part of the player is going to change the set outcome on the machine. The preset retention is adjustable by the owner of the game. The element of chance cannot be removed from the machines in question.

Sertell characterized reward as a thing of value however one achieves the value. As an example, points or credits that could be redeemed for something of value would satisfy the reward element. It is his opinion that all of these machines are gambling devices. If there were no tickets or coupons or other kind of reward, then they would not be a gambling device.

Sertell testified there is skill involved in identifying that a game such as these 32 machine is indeed a game, finding and understanding the directions of the game, understanding the rules of the game, and in actually playing the game itself. A player can also use strategy in certain methods of playing the machine.

7

He said a player has no control over the outcome of the pick and spin because of the random number generator.   He is convinced that these 32 games have a random number generator but he does not possess the software code information for these specific machines. This is the only way he would know they have a random number generator.  However, he can tell how the preset retention actually operates because he has the manual for the games.  There are diagrams in the manuals that set out what you will get in return if you set the switches in a particular pattern.  This recovery will be over a period of time based on the mathematical cycle of the machine.

Kevin Sharp is the claimant in this case.  He is the president of Kevin Sharp Enterprises, Inc.  He said he believed Kevin Sharp Enterprises, Inc. is the owner of the video redemption games in the State of Alabama.  He also has filed a claim for the U.S. currency seized from the games.  Sharp's company purchases the parts for the video games and assembles them.  Sharp testified that Berry Kelly is one of the people that owned the Movie Time Arcade where the video games in question were located.  There was a revenue sharing agreement between Kelly and Sharp.

Mr. Sharp testified that, in order to play any of the 32 machines, players are required to risk something of value.  The player must insert money into the machine.  Then the machine operates automatically or the push of a start button starts the play.  If the player wins, each of the machines ejects something of value.  They would print out a ticket for some kind of merchandise or a gift certificate at Wal Mart.  Mr. Brown, the deputy district attorney, asked Mr. Sharp, "That with any of the machines in court, that it is true, that no matter what skill or strategy the player employs, he is not going to successfully beat the machine".  To that Sharp responded, "I don't know".  He was then cross-examined about testifying in Fort Smith, Arkansas.  He testified that once a machine reaches a close proximity to its maximum payout it will select the number or symbol, which is not a winner.  He was asked the question; "No matter if I possess all of the skill

in the world to play this machine, if that machine is nearing its maximum pay-off, I couldn't beat it". To that Mr. Sharp responded, 'That would be correct' ".

The Defendant called Robert John Snyder, President of Bob Snyder & Associates, Inc., a California Corporation. The corporation was formed in 1983 to do consulting and forensic examination of game related products, exclusively in the gambling, gaming field, including amusement games. The company also does some training for governmental agencies. Over the last ten years, the majority of clients have either been law firms, game manufacturers, trade associations and, on a few occasions, law enforcement. From August 1969 to March 1983 the witness was employed as a Los Angeles County Sheriff's Department deputy in charge of gaming investigations. During his tenure with the sheriff's department he was the resident game expert of an 8,000 member department. He has served as a consultant regarding amusement and gaming issues for manufacturers, for the government, both the United States and Canada. He has conducted training seminars regarding video games including redemption and amusement games. These seminars have been in fifteen states. He has trained about 2,500 officers over the years. He has taught seminars for state attorneys general, colleges and universities, trade associations and on three occasions spoken at the FBI National Academy. He is also published.

Mr. Snyder made a cursory examination of the three machines that were sitting in court during the trial. The other 29 were examined for an 8-hour period prior to the trial. His examination consisted of recording the identification number of the game, the reference number that was attached to it, and then opening each machine. He examined the two hard meters on each machine, which are simply six digit meters that count, he looked at the circuit board, also know as the motherboard or the computer board and he looked at the duel inline packaging know as a DIP switch. These switches are small miniature on/off toggle switches, which are a common component of these machines. He noted the position of each of the switches, recorded

the numbers on the hard meters, the type of bill acceptors, in some cases the battery tie, the motherboard and some other items.

Mr. Snyder played each machine from 10 to 20 times. He explained to the Court about the double-up feature and how it operated. This feature works only if you win the initial spin. At that point, the player has the option to literally go double or nothing up to five times in a row or until the first loss occurs, or the player may opt to quit after the first double up period. In the double-up feature the player has to go to a different screen, a different format, a different game format and a different task. If the player is successful the credits double that have been risk. At that point the player can double-up again or take the credits and resume play or decide to cash out and quit completely.

Snyder testified that there is a strategy in playing the machines and it is best not to even use the double-up feature. There is a strategy in selecting a high or low poker card. Based on Snyder's testimony, if the player wins the first spin, then strategy comes into play. Based on the different strategies the outcome can be different. A player using strategy and skill could generally beat a player playing blindly. In the 32 games examined the owner could preset the game at a particular percentage of return.

During cross-examination by the State, Mr. Snyder stated that physical skill would apply in the nudge feature because of the time duration, you have a 3 second period that you must react. Therefore, the nudge factor requires some recognition and physical skill of pushing the button within the time window. If you use the nudge feature, the software will control what shows up on the reel. The software would control the next icon that is revealed. No matter how quickly the player reacts to the nudge, regardless of the physical skill, the machine will display whatever the software package calls for it to display. Snyder also determined that there was no skill involved in trying to stop the spinning reel with any particular icon.

Mr. Snyder was asked about truncation. He said that in the video games made the basis of this suit, that when you stopped the reel it doesn't lock instantaneously. It actually slows to a stop. So what happens out of view, unknown to a player, if you see an orange and you stop and the orange instantaneously changes to a banana, you would recognize that, but, because it slows to a stop, what happens out of the view of a player, or outside the screen area for visual effect, is unknown to a player and there are various methods for software to alter what might have occurred for a number of reasons. It could simply change a symbol but you would never see it. You could short-circuit it, you could delay it where you almost hit it the same as in the chasing lights. If you stopped and you figured out "Oh, I almost had it", maybe the player did have it; maybe the software said it is your time to miss. Mr. Snyder also testified that the term substitution and delay means that the machine would display the icon that the machine wanted to display or had predetermined it was going to display regardless of what the player did. The machine could alter that. There is no way of knowing that unless the software of the game is analyzed. He stated that he did attempt to stop all of the machines on a particular pattern, but he wouldn't expect to be able to do that. The 32 machines in question did not have a repeated pattern. This could be controlled by the software code set for the random number generator or it could just simply be a code of instruction in the software itself. He testified that each of the machines had DIP switches or an on screen menu, which has the ability for the operator of the machine to adjust the percentage of payout. He stated that the Las Vegas slot machine has a fixed percentage of holdback. He also testified that the fixed percentage coming back to the operator is through the number of possible outcomes that can mathematically be achieved versus the quantity of payouts. The operator is guaranteed a profit because there are more ways to lose than there are to win.

Mr. Snyder agreed that with the 32 machines in question, the predominate factor and the outcome of the game is chance. Each of the machines requires the player to risk something of -

11

value, which is money. He also agreed that the outcome of the game does depend, in a material

degree, upon elements of chance. Chance is the predominate factor.

## LAW OF THIS CASE

In 1996 the Alabama Legislature passed Act. No. 96-588, which became effective May

17, 1996. The defendants/claimant argue that, based on this Act, the seized video machines are

bona fide coin-operated amusement machines and are exempt from the gambling statutes, 13A-

12-20 through 30, *Code of Alabama.*

The Act was codified in the *Code of Alabama*, § 13A-12-76:

> Bona fide coin-operated amusement machines. (a) Sections 13A-12-70 to
> 13A-12-75, inclusive, shall not apply to a coin operated game or device
> designed and manufactured for bona fide amusement purposes which, by
> application of some skill, only entitles the player to replay the game or
> device at no additional cost if a single play of the bona fide coin-operated
> amusement machine or device can reach no more than 25 free replays or can
> be discharged of accumulated free replay, or rewards the player exclusively
> with merchandise limited to non-cash merchandise, prizes, toys, gift
> certificates, or novelties, each of which has a wholesale value of not more
> than Five Dollars ($5.00)....(d) A player of a bona fide coin-operated
> amusement machine may accumulate winnings for the successful play of a
> bona fide coin-operated amusement machine through either tokens or tickets,
> and may redeem these tokens or tickets for merchandise so long as the
> amount of tokens or tickets earned on a single play does not exceed Five
> Dollars ($5.00) per unit. (e)(1) For purposes of this section, "bona fide coin-
> operated amusement machine" means every machine of any kind or
> character used by the public to provide amusement or entertainment whose
> operation requires the payment of or the insertion of a coin, bill, other
> money, token, ticket or similar object, and the result of whose operation
> depends in whole or in part upon the skill of the player, whether or not it
> affords an award to a successful player, and which can be legally shipped
> inter-state according to federal law.   Examples of bona fide coin-operated
> amusement machines include, but are not limited to, the following:  c. video
> games.... (2) The term "bona fide coin-operated amusement machine" does
> not include the following: j. machines which are not legally permitted to be
> operated in Alabama. k. slot machines. l. video poker games....

The Alabama statute is void in giving a definition of some skill. The Alabama law tracks

the Georgia law. The Court has looked to O.C.G.A., 16-12-35 (a.1)

> As used in this Code section, the term "some skill" means any presence of
> the following factors, alone or in combination with one another:

12

(1) A learned power of doing a thing completely;
(2) A particular craft, art, ability, strategy, or tactic;
(3) A developed or acquired aptitude or ability;
(4) A coordinated set of actions, including, but not limited to, eye-hand coordination;
(5) Dexterity, fluency, or coordination in the execution of learned physical or mental tasks or both;
(6) Technical proficiency or expertise;
(7) Development or implementation of strategy or tactics in order to achieve a goal; or
(8) Knowledge of the means or methods of accomplishing a task.

The term "some skill" refers to a particular craft, coordinated effort, art, ability, strategy, or tactic employed by the player to affect in some way the outcome of the game played on a bona fide coin operated amusement machine as defined in paragraph (2) of Code Section 48-17-1. If a player can take no action to affect the outcome of the game, the bona fide coin operated amusement machine does not meet the "some skill" requirement of this Code section. (Emphasis added by this court)

O.C.G.A., § 48-17-1 (2) defines a coin operated amusement machine in:

"Bona fide coin operated amusement machines" means: (A) Every machine of any kind or character used by the public to provide amusement or entertainment whose operation requires the payment of or the insertion of a coin, bill, other money, token, ticket, or similar object and the result of whose operation depends in whole or in part upon the skill of the player, whether or not it affords an award to a successful player pursuant to subsections (b) through (g) of Code Section 16-12-35....

The Georgia Attorney General wrote an unofficial opinion Number U69-18 to respond to

Mr. Peter J. Skandalakis, District Attorney, Coweta Judicial Circuit, Troup County, LaGrange,

Georgia. Mr. Skandalakis asked the Georgia Attorney General:

[W]hether a certain video game which apparently offers up to $5.00 in merchandise when a player pays from $.25 to $2.00 for the opportunity to "spin" or "play" to gain the value of the result is a prohibited "gambling device."

In response the attorney general said that it may be a "gambling device" as contemplated in Georgia's gambling statues. (Emphasis added by this Court)

Under O.C.G.A. § 16-12-20 (2),

"[G]ambling device" means any contrivance which for consideration affords the player an opportunity to obtain money or other thing of value, the award of which is determined by chance even though accompanied by some skill, whether or not the prize is automatically paid by contrivance.

13

(Emphasis supplied). Applying this definition, a video slot machine which offers a value of up to $5.00 in merchandise for the change [sic] to play for the lesser amount of $.25 to $2.00 may be a "gambling device". See 1971 Op. Att'y Gen. 71-167. However, because of recently enacted statutory provisions found at O.C.G.A. §16-12-35 (d) (1), further analysis is required. That Code section provides: Nothing in this part shall apply to a coin operated game or device designated and manufactured only for bonafide amusement purposes which involves some skill in its operation if it rewards a player exclusively with free replays or merchandise limited to non-cash merchandise, prizes, toys, gift certificates, or novelties, but each of which has a wholesale value of not more than $5.00 for a single play of the game or device. A player may be rewarded with both free replays and non-cash merchandise, prizes, toys, gift certificates, or novelties for a single play of the game or device as provided in this Code section....

The later enacted O.C.G.A. § 16-12-35 (d) (1) does appear to remove any coin-operated game or device from the definition of "gambling device" if there is some skill involved in the operation of the device. <u>Therefore, the analysis of whether the video slot machine is a "gambling device" obviously depends on a specific, case-by-case determination of whether there is "some skill [involved] in its operation"</u>. (Emphasis added by this Court)

In summary, an analysis of the Georgia statutes indicates that where there is a bona fide coin operated amusement machine which takes some degree of skill to operate and there is a chance of winning up to $5.00 in merchandise then it is exempt from the gambling statutes of Georgia. However, if the player cannot take an "action to affect the outcome of the game" then the device becomes a gambling machine or slot machine.

An examination of the exclusions set out in Title 13A-12-76 to the bona fide amusement law indicates that Title 13A-12-70 through 74 is not applicable in this case. The exceptions do not exempt coin operated amusement machines, where no skill is employed, from the gambling statues found in 13A-12-20 through 30. Therefore, if the player cannot manipulate the outcome of the machine by some skill then it is a gambling devise. If the legislature had intended an exemption of 13A-12-76 from the gambling statutes it could have said Sections 13A-12-20 through 13A-12-30, inclusive, *Code of Alabama*, 1975 shall not apply to a coin operated game or device designated and manufactured for bona fide amusement purposes, which, etc.

14

The laws of the State of Alabama continue to prohibit "machines which are not legally permitted to be operated in Alabama, slot machines and video poker games". The law defines a gambling device as follows: "Any device, machine, paraphernalia or equipment that is normally used or usable in the playing phases of any gambling activity, whether that activity consists of gambling...by a person involving the playing of a machine..." *Code of Alabama*, 13A-12-20 (5).

Section 10 of that Code provision defines a slot machine: A gambling device that, as a result of the insertion of a coin or other object, operates, either completely automatically or with the aid of some physical act by the player, in such a manner that, depending upon elements of chance, it may eject something of value. A device so constructed or readily adaptable or convertible to such use is no less a slot machine because it is not in working order or because some mechanical act of manipulation or repair is required to accomplish its adaptation, conversion or workability. Nor is it any less a slot machine because apart from its use or adaptability as such it may also...deliver something of value on a basis other than chance.

Section (3) defines a contest of chance: Any...gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein. (Emphasis added by this Court)

The Code goes on to define:

(11) SOMETHING OF VALUE. Any money or property, any token, object or article exchangeable for money or property or any form of credit or promise directly or indirectly contemplating transfer of money or property or of any interest therein, or involving extension of a service entertainment or a privilege of playing at a game or scheme without charge.

13A-12- 20 (4) defines gambling. A person engages in gambling if he stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he...will receive something of value in the event of a certain outcome. (Emphasis added by this Court)

A person commits the crime of possession of a gambling device if with knowledge of the character thereof he manufactures..., places or possesses, or conducts or negotiates any transaction affecting or designed to affect ownership, custody or use of: (1) A slot machine; or (2) Any other gambling device, with the intention that it be used in the advancement of unlawful gambling activity. 13A-12-27 (a), *Code of Alabama*.

The law provides for the forfeiture of gambling devices and gambling proceeds in Title

13A-12-30, *Code of Alabama*.

Mr. Sertell said that each of the machines require that the player risk something of value to play, (currency). The machines are capable of being operated by some physical act of the player, but once a player begins play, the machine will complete the play absent any further action by the player. The machine operates automatically whether the player does anything else or not and the outcome on all 32 machines depends, in a material degree, on the element of chance. He said the machines determine in advance what symbols it's going to give the player. The player's pressing of the stop button or skill play buttons does not affect the outcome whatsoever. The outcome is left to the computer program in the device. Each of the 32 machines has a retention device and the overwhelming majority of the machines are set to retain 40%, two 45%, one 38% and the other 30% of the currency at risk. Regardless of what the player does over the long run he is never going to win. He testified that the 32 machines are gambling devices because they offer the elements of consideration, chance and reward. The element of chance cannot be removed from the machines in question. No amount of skill on the part of the patron is going to change the set outcome on the machine, which is preset by the owner.

Kevin Sharp, the defendant/claimant, said that players are required to risk something of valve, that the machines operate automatically or the push of the start button starts the play. If the player wins the machine will eject something of value. He was asked in Fort Smith, Arkansas, "No matter if I possess all the skill in the world to play this machine, if that machine is nearing its maximum pay-off I couldn't beat it" to that Mr. Sharp responded, "That would be correct". He testified that once a machine reaches a close proximity to its maximum payout it will select the number or symbol, which is not a winner.

Mr. Robert John Snyder testified that the 32 games could be pre-set for a particular percentage of return. He testified that no matter how quickly a player reacts the machine will display whatever the software package calls for it to display. There is no skill involved in trying

16

to stop the spinning reel on each of these machines. The machines also have a feature that when the player pushes the stop button it doesn't lock instantaneously. It actually slows to a stop. This is based on the various methods set by the software to alter what might have occurred by the reaction of the player. The software can change the symbol, it can short circuit the symbol or delay it. If the player stopped and thought, I almost had it, maybe the player did have it but the software said that it was time for him to miss. Snyder explained that the term substitution and delay means that the machine would display the icon that the machine wants to display or had predetermined it was going to display regardless as to what the player did. The machine could alter what the player does. He attempted to stop all the machines on a particular pattern but said that he did not expect to be able to do that. He also agreed that the 32 machines had DIP switches or an on screen menu that the operator could adjust the percentage of payout so the operator is guaranteed a profit. Snyder said that with the 32 machines the predominate factor and the outcome of the game is chance. In order to begin play the player must risk something of value and the outcome of the game depends, in a material degree, upon the element of chance which is the predominate factor.

The evidence before this Court is that the initial play and the determination of whether or not a player wins or looses is left entirely to the video machine. Play does not continue unless the machine and its random numbers generator or program determines that the player is to win. No amount of skill on the part of the player or factors such as bonuses, double up, hold and re-spin, nudge option and free replays occurs by any skill of the player on the initial spin of the machine. The initial win is left totally to the element of chance. No matter what level of skill has been achieved by the player can he beat the element of chance in each of these machines. Therefore, there is no skill factor. There is no way for a player to beat the house when the machine and its computer determine the outcome in all cases.

The Court finds from the evidence that the 32 machines in question are gambling devices and slot machines as set out in Title 13A-12-20, *Code of Alabama*. The Court finds that said machines and the currency are contraband and should be forfeited to the State of Alabama pursuant to Title 13A-12-30, *Code of Alabama*, 1975. The Court further orders that the machines be destroyed and the currency transmitted to the General Fund of the State of Alabama.

The costs of court are taxed to Kevin Sharp Enterprises, Inc. and Barry Kelly.

Done and Ordered this the 6th day of July 2001.

Wayne Thorn/Presiding Judge

cc:    Roger Brown, Esq.
       Melissa Bender, Esq.
       John M. Bolton, III, Esq.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHEN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| NOVEL MANAGEMENT, INC., )<br>d/b/a SPIN & WIN ARCADE, an Alabama Corporation; )<br>ALABAMA VENTURES, L.L.C., d/b/a WINNERS )<br>WORLD ARCADE, an Alabama Limited Liability Company; )<br>HOT SPOT ARCADE, INC., an Alabama Corporation )<br>d/b/a; ISLANDS ARCADE AND CHINA GARDEN )<br>ARCADE; SUN RAYS, INC., an Alabama )<br>Corporation d/b/a SUN RAYS ARCADE; )<br>MICHAEL PORTER and FRANCESCO SCOPELLETTI )<br>d/b/a GOLD MINE ARCADE, a partnership; )<br>VILLA AMUSEMENT, L.L.C., an Alabama Limited )<br>Liability Company, d/b/a Villa Arcade; MR. R. KADE, )<br>INC., an Alabama Corporation, d/b/a MR. R. KADE, )<br><br>       Plaintiffs, )<br><br>v. )<br><br>JIM WOODWARD, Sheriff of Jefferson County )<br>Alabama, his deputies, officers, agents and any person(s) )<br>acting in concert with him, )<br><br>       Defendant. ) | Civil Action No. |

**CERTIFICATE OF ATTORNEY**

I, Samuel Maples, am one of the attorneys for the Plaintiffs in the above captioned proceeding. In support of Plaintiffs' request for a temporary restraining order contained within the complaint filed in the above styled matter and pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, I hereby certify as follows:

The Defendant's attorney, Albert L. Jordan, has been given notice of the Plaintiffs' request for a temporary restraining order.

Dated this 8th day of July, 2001.

Samuel Maples
Attorney for Plaintiffs
1804 7th Avenue North
Birmingham, AL 35203
(205) 322-2333

se

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| NOVEL MANAGEMENT, INC.,<br>d/b/a SPIN & WIN ARCADE, an Alabama Corporation;<br>ALABAMA VENTURES, L.L.C., d/b/a WINNERS<br>WORLD ARCADE, an Alabama Limited Liability Company;<br>HOT SPOT ARCADE, INC., an Alabama Corporation<br>d/b/a; ISLANDS ARCADE AND CHINA GARDEN<br>ARCADE; SUN RAYS, INC., an Alabama<br>Corporation d/b/a SUN RAYS ARCADE;<br>MICHAEL PORTER and FRANCESCO SCOPELLETTI<br>d/b/a GOLD MINE ARCADE, a partnership;<br>VILLA AMUSEMENT, L.L.C., an Alabama Limited<br>Liability Company, d/b/a Villa Arcade; MR. R. KADE,<br>INC., an Alabama Corporation, d/b/a MR. R. KADE,<br><br>        Plaintiffs,<br><br>v.<br><br>JIM WOODWARD, Sheriff of Jefferson County<br>Alabama, his deputies, officers, agents and any person(s)<br>acting in concert with him,<br><br>        Defendant. | Civil Action No. |

## CERTIFICATE OF ATTORNEY

I, Douglas Corretti, am one of the attorneys for the Plaintiffs in the above captioned proceeding. In support of Plaintiffs' request for a temporary restraining order contained within the complaint filed in the above styled matter and pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, I hereby certify as follows:

The Defendant's attorney, Albert L. Jordan, has been given notice of the Plaintiffs' request for a temporary restraining order.

Dated this 8th day of July, 2001.

Douglas Corretti
Attorney for Plaintiffs
Corretti, Newsom & Hawkins
1804 7th Avenue North
Birmingham, AL 35203
(205) 322-2333

EXHIBIT 2

# The Birmingham News

**Just for Kids:** *The Smithsonian's super plane display / 1B*

# Saturday

July 7, 2001

**BIRMINGHAM POST-HERALD**

Alabama's old-time barber shops getting trimmed **INSIGHT E1**

# Video gambling ruled illeg

## Sheriff to seize machines Monday

By CARLA CROWDER
*News staff writer*

A circuit judge ruled Friday that video gambling machines are illegal in Jefferson County, prompting authorities to announce plans to seize them next week.

Presiding Judge Wayne Thorn

found that the machines "are gambling devices and slot machines," which state law proscribes. The ruling issued at 4 p.m. took effect immediately, making possession of the machines illegal.

"This is terrible," said Avery Shumpert, manager of Spin-O-

Mania Arcade in Center Point, as she told her customers Friday night they had to leave. "I feel like crying. I think they should have given us at least 30 days."

Sheriff Jim Woodward said he would begin a roundup Monday. He said he needs trucks and storage space.

"We'll commence to put together a task force over the weekend and start seizing them wherever we find them," Woodward said.

The machines flourished after the Legislature passed a law in 1996 to allow children to play Skee-ball and the like at pizza parlors and arcades. The so-called "Chuck E. Cheese" law permits prizes worth $5 or less, but not cash payoffs.

Last month, 4,900 video gaming machines lit up 78 arcades throughout Jefferson County. The number of machines had more

▶ See **Gambling,** Page 2A

Windom's

Hanss

NOTHING LIKE 2000 – YET

SPIN-O-MANIA
NO ONE UNDER
ADMITTED

NEWS STAFF/

sun. In a normal summertime weather pattern for Alabama, a high that anchors in the Atlantic Ocean blows winds that carry moisture into Alabama from the Gulf of Mexico.

Under these conditions, the normal high for the end of June in Birmingham is 89 and the normal high on July 4 is 90. This year's temperatures are much closer to normal than last year's,

Later this summer Birmingham can expect a dose of the oppressive heat that chases women into sun dresses, turns the bald spot on a man's head into an ache, and leaves filmy dews of sweat on the upper lips of small children.

"I guarantee you, before the summer is over, it'll be hot and dry," said Wilfing. Those conditions will boost the temperature

this year, an orange alert reading at Helena on June 28.

In 2000, Birmingham first exceeded the ozone standard on May 31 and the area had seven days of orange ozone readings at multiple monitoring sites by July 6, Bell said. "Orange alert" is a lower level ozone alert, meant to warn the young, the elderly and those with respiratory problems, to stay inside between noon and 6 p.m.

# Meteorologists issue 'orange alert' on ozone

**By KATHERINE BOUMA**
*News staff writer*

Meteorologists put the Birmingham area on the first air pollution "orange alert" of the summer today, predicting ozone levels that could harm children and other sensitive people.

Birmingham has been lucky so far, with a cool, wet summer that held pollution low for several weeks, said Ron Gore, chief of the air division for the Alabama Department of Environmental Management.

"We've not really reached the real danger period, which is

generally mid-July to mid-August," Gore said.

Ground-level ozone forms when nitrogen dioxide and volatile organic compounds, usually from combustion, cook together in hot, bright weather. The corrosive chemical damages lungs and other tissue and triggers asthma attacks. Even healthy people can suffer lung damage and tightness of chest.

ADEM officials believe much of the ozone probably is caused by Alabama Power plants. But a signicant amount is caused by traffic and everyday activities.

Experts ask everyone to follow

some rules, particularly on days when high ozone is expected:

Limit driving. Carpool, bike, walk or ride the bus. Avoid drive-throughs. Drive only your newest, best-maintained vehicle. Use gasoline-powered lawn and gardening equipment after 6 p.m. Refuel your vehicle after 6 p.m. and don't top off the tank. Avoid excessive idling and jackrabbit starts.

Use an electric starter or charcoal chimney instead of lighter fluid. Postpone using oil-based paints, solvents and stains. Save energy. Turn off lights and set air conditioners at 78 degrees.

# GAMBLING:
## Jeffco DA expects appeal

▶ From Page **1A**

than doubled in six months despite legal ambiguities.

Friday's ruling stems from a November 1999 raid at the Movie Time Arcade on Center Point Road. Deputies seized $1,895 in cash and 32 video gambling machines. Tennessee businessman Kevin Sharp, who owned the seized machines, argued that they were legitimate games of amusement. They require skill, and should fit under the Chuck E. Cheese law, he argued.

Movie Time was awarding winners $5 Wal-Mart gift certificates. No movies were shown there, but snacks such as potato chips and candy were available free.

Thorn's ruling was based in part on testimony from gambling industry consultants. They determined that the seized machines were exclusively games of chance.

"No amount of skill on the part of the patron is going to change the set outcome on the machines, which is preset by the owner," Thorn wrote in the ruling. "There is no way for a player to beat the house when the machine and its computer determine the outcome in all cases."

He ruled that Sharp's machines are contraband, and must be destroyed.

Jefferson County District Attorney David Barber said he expects an appeal in the case. However, an appeal would not stop Friday's decision from taking effect.

Video game suppliers, mostly from other states, install the machines, splitting profits with small business owners. They will not lose the machines if they remove them by Monday.

"If those people load up their machines tomorrow, and get them out of Jefferson County, they're home free," Barber said.

But merely unplugging them will not suffice.

"Those machines are illegal to possess. That goes for everything in Jefferson County," Woodward said. "I don't care if it's plugged in or not."

Ms. Shumpert said she was shutting down the machines because she feared the authorities would damage or confiscate them. She said the arcade's owner, who lives in South Carolina, had invested about $5,000 in 68 machines.

Now the Pot-O-Gold, Super Cherry Master, Triple Jack and Treasure Quest will have to be mothballed. Employees at several area arcades said Friday night that they began shutting down the machines immediately.

"They're taking everything," said Cindy Lance, who has worked at M T Arcade in Center Point about two years.

The ruling means she'll lose her job, she said.

About 100 players come to the arcade on a typical day. It's harmless fun, said Ms. Lance, who was disappointed by the judges' decision.

"I think it's ridiculous. There is nothing wrong with the arcades. There is no crime, no drugs, no alcohol. There's just middle-aged people entertaining themselves. There's nothing illegal or wrong with anything going on."

# *Track Talk*

**Volume 1 Number 5**     **July 2001**

**A publication of Victoryland Greyhound Park and The Birmingham Race Course**

**Track opens video entertainment center**     EXHIBIT 3

# More fun at VictoryLand

There will be more fun at VictoryLand. The track recently opened the new 10,000 square foot VictoryLand Video Entertainment Center, complete with 300 bonafide amusement machines.

One will find the highest quality amusement machines at the VictoryLand Video Entertainment Center. The machines are truly "State-of-the-Art" with touch screens and multi-game options. All games require skill or allow the participant to use skill to affect the outcome.

The best news for visitors to the Center is the payback. "Our machines will offer the highest payback to participants compared to other locations in the State of Alabama," remarked Stan Hubbard, former racing director at VictoryLand and now manager of the Center.

Over 300 machines were purchased by the Center from Cadillac Jack, a manufacturer in Georgia. The majority of the machines are

*"We are extremely pleased to offer our VictoryLand customers video entertainment at its best. Victory-Land will have the finest game selection and customer service in video entertainment that is available in Alabama. We are very proud of our new video entertainment operation and would like to invite everyone to visit us soon."*

*-Milton McGregor*
*President of VictoryLand*

from manufactured lines known as Southern Gold, Pot of Gold and Gold Touch. Most of the units are 3,5,8 and 9 line game types.

To maximize customer service and convenience, the Center will utilize tokens, which have no cash value. The tokens collected from a machine may be redeemed for gift certificates. "There will be a wide variety of gift certificate options,"

Hubbard said. "We have over 30 national and regional retailers' gift certificates from which to choose."

The Center will be an exciting place to visit. It will also be relaxing and comfortable. All machines will have cushy, comfortable chairs. "We will also have cocktail service for our visitors, and the coldest draft beer anywhere," Hubbard said.

The Center, located inside VictoryLand, will be isolated from racing operations, which will add to the relaxing atmosphere. Customer service representatives will also be available to offer assistance and the Center will have brochures to provide patrons with an understanding of the various games.

If you have been unable to visit the center, make plans to visit soon. The fun awaits you!

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF ALABAMA
SOUTHERN DIVISION

NOVEL MANAGEMENT, INC., )
d/b/a SPIN & WIN ARCADE, an Alabama Corporation; )
ALABAMA VENTURES, L.L.C., d/b/a WINNERS ) Civil Action No.
WORLD ARCADE, an Alabama Limited Liability Company; )
HOT SPOT ARCADE, INC., an Alabama Corporation ) CV-01-BU-1699-S
d/b/a; ISLANDS ARCADE AND CHINA GARDEN )
ARCADE; SUN RAYS, INC., an Alabama )
Corporation d/b/a SUN RAYS ARCADE; )
MICHAEL PORTER and FRANCESCO SCOPELLETTI )
d/b/a GOLD MINE ARCADE, a partnership; )
VILLA AMUSEMENT, L.L.C., an Alabama Limited )
Liability Company, d/b/a Villa Arcade; MR. R. KADE, )
INC., an Alabama Corporation, d/b/a MR. R. KADE, )
)
            Plaintiffs, )
)
v. )
)
JIM WOODWARD, Sheriff of Jefferson County )
Alabama, his deputies, officers, agents and any person(s) )
acting in concert with him, )
)
            Defendant. )

**TEMPORARY RESTRAINING ORDER**

1.    This matter came on to be heard on the Plaintiffs' Verified Complaint and request for

the issuance of a temporary restraining order in the above styled matter.  It appears to this Court that

after due consideration of the allegations in the Verified Complaint and the arguments of counsel that

a temporary restraining order is due to be issued for good cause shown provided the Plaintiffs post

a good and sufficient bond in the amount of _____ approved by the Clerk of the District Court.

The Court further rules that in order to maintain the status quo among the parties and in order to

prevent further irreparable harm and injury to the Plaintiffs before a hearing can be conducted on the

Plaintiffs' request for a preliminary injunction that a temporary restraining order is due to be issued

enjoining the Defendant from committing the acts as mentioned below in paragraph 3.

2.    The Court holds that if the Defendant, Jim Woodward, his deputies and agents, closes the Plaintiffs' businesses, threatens the Plaintiffs' and the employees of the Plaintiffs' businesses with arrest and seizes or attempts to seize and destroy amusement machines and currency belonging to the Plaintiffs during the pendency of this action the Plaintiffs will suffer irreparable harm and injury.

3.    Therefore, this Court hereby orders the Defendant, Jim Woodward, his deputies, his officers, servants, agents, employees and any other person(s) acting in concert with the Defendant, Jim Woodward, Sheriff of Jefferson County, Alabama to immediately cease, desist and refrain from committing any acts to close the Plaintiffs' businesses down, threaten the Plaintiffs or Plaintiffs' employees with arrest, seize, attempt to seize or destroy any of the Plaintiffs' amusement machines and currency.  The Defendant, his deputies, officers, agents, employees and any other person(s) acting in concert with the Defendant, is hereby enjoined from committing any of the above mentioned acts.

4.    This order shall expire on July 18, 2001, unless within this time the order for good cause shown is extended for a like period or unless the Defendant against whom the order is directed consents that it may be extended for a longer period.

5.    The Plaintiffs' request for the issuance of preliminary injunction is hereby set down for hearing on the _____ day of _____, 2001, at _____ o'clock __.m.

6.    The Clerk of the United States District Court, is hereby directed to serve upon the Defendant, Jim Woodward, a sufficient number of copies (10) of this order so that the Defendant, Jim Woodward, can provide copies to his officers, agents, servants, attorneys or those person(s) acting in concert with him.

Done and Ordered this _____ day of _____, 2001, at _____ o'clock p.m.

_____
UNITED STATES DISTRICT JUDGE